**No. 24-12148**

_____

*In the*

# United States Court of Appeals

*for the*

# Eleventh Circuit

_____

JON HOAK, ANTHONY FANO, ALLAN QUICK, PATRICIA GIERING,
and NANCY PARIN, on behalf of themselves and those similarly situated,
*Plaintiffs-Appellees*,

– v. –

ANDREA LEDFORD et al.,
*Defendants*,

and

PLAN ADMINISTRATOR OF THE PLANS OF NCR CORPORATION,
*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of Georgia
Case No. 15-cv-3983, Hon. Amy Totenberg

_____

**OPENING BRIEF FOR DEFENDANT-APPELLANT**

_____

PAUL W. HUGHES
SARAH P. HOGARTH
CHARLES SEIDELL
*McDermott Will & Emery LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the following list contains all trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, and parent corporations, any publicly held company that owns 10% or more of a party's stock, and other identifiable legal entities related to a party:

Bondurant Mixson & Elmore — counsel for Plaintiffs-Appellees

Bracket, David G.H. — counsel for Plaintiffs-Appellees

Bramlett, Jeffrey O. — counsel for Plaintiffs-Appellees

Broshuis, Garrett R. — counsel for Plaintiffs-Appellees

Compensation and Human Resource Committee of NCR Corporation Board of Directors — Defendant (dismissed below)

Fano, Anthony — Plaintiff-Appellee

Gage, Rachel Frazier — counsel for Defendants

Giering, Patricia — Plaintiff-Appellee

Hoak, Jon — Plaintiff-Appellee

Hoffman, Chistopher A. — counsel for Plaintiffs-Appellees

Hogarth, Sarah P. — counsel for Defendant-Appellant

Hughes, Paul W. — counsel for Defendant-Appellant

Jacob, Gregory F. — counsel for Defendants

Korein Tillery, LLC — counsel for Plaintiffs-Appellees

Klenov, Michael E. — counsel for Plaintiffs-Appellees

Littlefield, Jeremy U. — counsel for Defendants

Ledford, Andrea — Defendant (dismissed below)

NCR Corporation — Defendant (dismissed below)

NCR Voyix Corporation (Ticker: NCR) — renamed corporation, formerly known as NCR Corporation (a defendant dismissed below)

O'Melveny & Myers LLP — counsel for Defendants

Parin, Nancy — Plaintiff-Appellee

Plan Administrator of the Plans of NCR Corporation — Defendant-Appellant

Quick, Allan — Plaintiff-Appellee

Rigsbee, Timothy S. — counsel for Plaintiffs-Appellees

Robbins Alloy Belinfante Littlefield LLC — counsel for Defendants

Seidell, Charles H. — counsel for Defendant-Appellant

Sheehan, Matthew J. — counsel for Defendants

Sprong, Douglas S. — counsel for Plaintiffs-Appellees

Totenberg, Amy — United States District Judge for the Northern District of Georgia.

/s/ *Paul W. Hughes*
Paul W. Hughes

## STATEMENT REGARDING ORAL ARGUMENT

The district court's orders resulted in a judgment worth tens of millions of dollars based on complex and nuanced questions concerning the interpretation of plan documents and the applicability of ERISA. This appeal will also raise significant questions about the meaning and application of this and other courts' published precedents. Appellant respectfully submits that oral argument would be valuable to the Court as it assesses the important issues presented in this appeal.

## TABLE OF CONTENTS

Certificate of Interested Persons and
    Corporate Disclosure Statement .......................................................C-1

Statement Regarding Oral Argument ............................................................ i

Table of Authorities ..................................................................................... iv

Introduction .................................................................................................. 1

Jurisdiction .................................................................................................... 3

Issue Statement ............................................................................................. 3

Statement of the Case ................................................................................... 4

    A.   Legal background ............................................................................ 4

    B.   Factual background ........................................................................ 6

    C.   Procedural background ................................................................. 11

Summary of Argument ................................................................................ 18

Standard of Review ..................................................................................... 20

Argument ..................................................................................................... 21

I.    The Plans authorize termination of annuities by paying the
    lump sums the Administrator selected. ............................................... 21

    A.   The Plans permit converting annuities to actuarially
          equivalent lump sums upon termination. .................................. 21

         1.   The district court erred in allowing plaintiffs'
              untimely claim challenging the use of lump sums............... 22

         2.   The Plans unambiguously authorize conversion of
              annuities to lump sums as part of termination.................... 27

              a.   The right to terminate an ongoing stream of
                  payments inherently includes the ability to provide
                  a lump sum. .................................................................... 28

              b.   Conversion from an annuity to an equivalent sum
                  maintains the value of the benefit................................. 34

         3.   At a minimum, the Administrator's interpretation is
              reasonable.......................................................................... 39

    B.   The Administrator correctly—and at least reasonably—
          selected a 5% discount rate. ....................................................... 48

C.   At the very least, the Administrator presented enough evidence to warrant a trial. .......................................................... 50

II.   The district court erred in awarding plaintiffs a windfall inconsistent with their own theory. ...................................................... 51

A.   Reinstating the annuities was the appropriate remedy given the district court's prior holdings. ................................................. 52

B.   Prejudgment interest is unwarranted where plaintiffs complain of having been paid too much, too quickly. ................... 55

Conclusion ................................................................................. 57

# TABLE OF AUTHORITIES

## Cases

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004) ................................................................. 4

*Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*,
833 F.3d 1299 (11th Cir. 2016) ............................................. 45

*Barber v. Krepp*,
680 F. App'x 819 (11th Cir. 2017) ......................................... 56

*Bender v. Xcel Energy, Inc.*,
507 F.3d 1161 (8th Cir. 2007) ............................................... 44

*Blankenship v. Metropolitan Life Ins. Co.*,
644 F.3d 1350 (11th Cir. 2011) ................................... 38, 41, 42

*Cagle v. Bruner*,
112 F.3d 1510 (11th Cir. 1997) ............................................. 46

*Call v. Ameritech Management Pension Plan*,
475 F.3d 816 (7th Cir. 2007) ............................................. 9, 49

*Carden v. Aetna Life Ins. Co.*,
559 F.3d 256 (4th Cir. 2009) ................................................. 47

*Carr v. First Nationwide Bank*,
816 F. Supp. 1476 (N.D. Cal. 1993) ................................. 32, 33

*Clemons v. Norton Healthcare Inc. Ret. Plan*,
890 F.3d 254 (6th Cir. 2018) ................................................. 47

*Colardo-Keen v. Rockdale Cnty., Ga.*,
775 F. App'x 555 (11th Cir. 2019) ......................................... 23

*Comrie v. IPSCO, Inc.*,
636 F.3d 839 (7th Cir. 2011) ................................................. 44

*Conkright v. Frommert*,
559 U.S. 506 (2010) ............................................................... 4

*Craig v. Pillsbury Non-Qualified Pension Plan*,
458 F.3d 748 (8th Cir. 2006) ................................................. 44

*D & H Therapy Assoc. LLC v. Boston Mut. Life Ins. Co.*,
640 F.3d 27 (1st Cir. 2011) ................................................... 47

*Diveroli v. United States*,
803 F.3d 1258 (11th Cir. 2015) ............................................. 22

iv

## Cases—continued

*Doe #6 v. Miami-Date Cnty.*,
   974 F.3d 1333 (11th Cir. 2020) ............................................................ 26

*Evans Prods. Co. v. W. Am. Ins. Co.*,
   736 F.2d 920 (3d Cir. 1983).................................................................... 27

*Firestone Tire & Rubber Co. v. Bruch*,
   489 U.S. 101 (1989) .........................................................40, 43, 44, 45, 47

*Gilmour v. Gates, McDonald & Co.*,
   382 F.3d 1312 (11th Cir. 2004) ....................................................... 23, 24

*Glazer v. Reliance Standard Life Ins. Co.*,
   524 F.3d 1241 (11th Cir. 2008) ............................................................ 29

*Goldfarb v. Reliance Standard Life Ins. Co.*,
   106 F.4th 1100 (11th Cir. 2024)............................................................ 20

*Goldstein v. Johnson & Johnson*,
   251 F.3d 433 (3d Cir. 2001)................................................5, 42, 43, 44, 45

*Holloman v. Mail-Well Corp.*,
   443 F.3d 832 (11th Cir. 2006) .........5, 26, 29, 30, 34-39, 41, 42, 49, 53, 55

*In re Int'l Admin. Servs., Inc.*,
   408 F.3d 689 (11th Cir. 2005) .............................................................. 55

*Jones v. Am. Gen. Life and Acc. Ins. Co.*,
   370 F.3d 1065 (11th Cir. 2004) ............................................................ 45

*Kemmerer v. ICI Americas, Inc.*,
   70 F.3d 281 (3d Cir. 1995)................................................................... 33

*Kimber v. Thiokol Corp.*,
   196 F.3d 1092 (10th Cir. 1999) ............................................................ 47

*Mason v. Cont'l Grp., Inc.*,
   763 F.2d 1219 (11th Cir. 1985) ............................................................ 25

*Mena v. McArthur Dairy, LLC*,
   352 F. App'x 303 (11th Cir. 2009)......................................................... 23

*Mendez v. Teachers Inc. & Annuity Ass'n &*
*College Ret. Equities Fund*,
   982 F.2d 783 (2d Cir. 1992)............................................................. 55, 56

*Milam v. Am. Elec. Power Long Term Disability Plan*,
   2012 WL 5930590 (S.D. Ohio 2012)...................................................... 54

## Cases—continued

*Morton v. Smith*,
91 F.3d 867 (7th Cir. 1996) ............................................................. 43, 47

*Mut. Serv. Ins. Co. v. Frit Indus., Inc.*,
358 F.3d 1312 (11th Cir. 2004) ............................................................. 21

*Nachman Corp. v. Pension Benefit Guarantee Corp.*,
446 U.S. 359 (1980) ...................................................................... 4

*Niebauer v. Crane & Co., Inc.*,
783 F.3d 914 (1st Cir. 2015)............................................................. 44

*Oravec v. Sunny Isles Luxury Ventures, L.C.*,
527 F.3d 1218 (11th Cir. 2008) ............................................................. 24

*Pagan v. NYNEX Pension Plan*,
52 F.3d 438 (2d Cir. 1995)............................................................. 47

*Paneccasio v. Unisource Worldwide, Inc.*,
532 F.3d 101 (2d Cir. 2008)............................................................. 44

*Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*,
467 U.S. 717 (1984) ...................................................................... 4

*Perrino v. S. Bell Tel. Co.*,
209 F.3d 1309 (11th Cir. 2000) ............................................................. 25

*Pilot Life Ins. Co. v. Dedeaux*,
481 U.S. 41 (1987) ...................................................................... 4

*Plotnick v. Comput. Scis. Deferred Comp. Plan for Key Execs.*,
875 F.3d 160 (4th Cir. 2017) ............................................................. 44

*Porter v. Lowe's Cos. Inc.'s Business Travel Acc. Ins. Plan*, 731
F.3d 360 (5th Cir. 2013) ............................................................. 47

*Reese v. Herbert*,
527 F.3d 1252 (11th Cir. 2008) ............................................................. 27

*Robertson v. Standard Ins. Co.*,
2015 WL 13682034 (D. Or. 2015)............................................................. 54

*Rush Prudential HMO v. Moran*,
536 U.S. 355 (2002) ...................................................................... 5

*Silverpop Sys., Inc. v. Keading Market Tech., Inc.*,
641 F. App'x 849 (11th Cir. 2016)............................................................. 31

**Cases—continued**

*Sosa v. Airprint Sys., Inc.*,
   133 F.3d 1417 (11th Cir. 1998) (per curiam).........................20, 22, 23, 24

*Starr v. MGM Mirage*,
   2008 WL 11451257 (D. Nev. 2008) ........................................................ 30

*Sznewajs v. U.S. Bancorp Amended & Restated*
   *Supp. Benefits Plan*,
   572 F.3d 727 (9th Cir. 2009) ................................................................. 44

*Taylor v. NCR Corp.*,
   2015 WL 5603040 (N.D. Ga. 2015) ........................................... 30, 33, 34

*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009) ............................................................... 52

*Varazo v. Keiser Corp.*,
   754 F. App'x 918 (11th Cir. 2018) ......................................................... 24

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) ................................................................................ 5

*Welch v. Celotex Corp.*,
   951 F.2d 1235 (11th Cir. 1992) ............................................................. 51

*White v. Coca-Cola Co.*,
   542 F.3d 848 (11th Cir. 2008) ............................................................... 46

*Winters v. Costco Wholesale Corp.*,
   49 F.3d 550 (9th Cir. 1995) ............................................................. 46, 47

*Zebrowski v. Evonik Degussa Corp. Admin. Comm.*,
   578 F. App'x 89 (3d Cir. 2014) ............................................................. 43

**Statutes**

28 U.S.C.
   § 1291 .................................................................................................... 3
   § 1331 .................................................................................................... 3

29 U.S.C.
   § 1003(a)................................................................................................. 5
   § 1051(2)............................................................................................. 5, 6
   § 1056(d)(1) ........................................................................................... 6
   § 1081(a)(3) ....................................................................................... 5, 6
   § 1101(a)(1) ...................................................................................... 5, 6, 7
   § 1132(a)(1)(B) ..................................................................................... 53
   § 1132(e)................................................................................................ 3

## Other Authorities

26 C.F.R.

    § 1.409A-3 ................................................................................. 28

    § 1.409A-3(j)(4)(ix) .................................................................. 29

    § 1.409A-3(j)(4)(ix)(C)(4) ....................................................... 29

Dep't of Labor, *Pension & Welfare Benefit Programs*, Op. Ltr.

    90-14A, 1990 WL 123933 (May 8, 1990) ........................... 5, 45

Fed. R. Civ. P.

    15(a)(2) ................................................................................... 22

    16 ............................................................................... 22, 23, 24

    16(b) .............................................................................. 22, 23

    56(a) ....................................................................................... 50

    62 ............................................................................................ 18

## INTRODUCTION

NCR Corporation, like many other companies, provided "top hat" retirement plans as a benefit for highly compensated executives. Named after the kind of hat worn by Mr. Monopoly, top-hat plans are an executive perk, often allowing executives to defer or avoid tax obligations that would otherwise be due when these individuals are at their earning peaks. In recognition that "top hat" plans are reserved for only the most sophisticated individuals, many of ERISA's normal protections do not apply; for example, the plans are unfunded and the administrator owes no fiduciary duty.

NCR's top-hat Plans gave the Administrator the power to terminate each Plan, so long as that termination did not adversely affect the accrued benefits—here, lifetime annuities. The Plans also granted binding authority to the Administrator to interpret each plan. Exercising that authority, the Administrator terminated the plans in 2013 and paid each participant a lump sum equal to the value of their benefit, calculated using a well-settled formula for converting annuities with future payments into present-value lump sums—using a discount rate (here, of 5%, to account for NCR's default risk and the time-value of money) and standard mortality tables.

Plaintiffs sued, challenging the chosen discount rate. But when it came time for summary judgment years later, they fundamentally reworked their claim to argue that the Plan did not allow conversion of the annuities

1

to lump sums *at all*. The district court allowed plaintiffs to amend, granted summary judgment based on that new theory, and ordered the Administrator to pay substantial additional sums to each participant.

The district court's errors require reversal. On liability, the Plans provide the Administrator with the right to terminate the Plans; this right to terminate necessarily includes the right to pay a lump sum actuarially equivalent to the annuity. That is simply what termination *is*. The district court fixated on the absence of express authorizing language. But that gets the law exactly backwards. The Plans *authorize* the Administrator's approach by not expressly foreclosing it and granting the Administrator discretion. The Administrator here reasonably interpreted the Plans and ensured that each participant received the full value of the benefits they had accrued upon plan termination. ERISA demands nothing more.

On remedy, the court rejected the Administrator's intuitive and administrable proposal: simply reinstate the annuities. That decision was at odds with its liability holding and resulted in a windfall for plaintiffs. That error was only compounded by the court's award of prejudgment interest on money that plaintiffs received *earlier* than they would have under their own legal theory.

The district court thus awarded plaintiffs substantially *more* than that to which they were entitled under the original Plans. That is because

2

an unfunded annuity backed by an NCR guarantee is worth materially *less* than an annuity backed by a licensed and bonded insurance company—NCR, especially at the time of the actions in question, had material default risk, and Plaintiffs bore that risk prior to the plan termination.

Plaintiffs' own conduct in this litigation proves that an unsecured obligation by NCR is worth less than an obligation secured by a bonded insurer. After the district court entered judgment below, NCR asked plaintiffs to forego an appellate bond. Plaintiffs refused. R.245:¶6. They instead insisted that NCR post a bond to secure the judgment. NCR has done so. This proves the obvious: An obligation secured by NCR has less economic value than an equivalent obligation secured by a regulated insurer. The district court's decision is irreconcilable with this basic point.

## JURISDICTION

The district court had jurisdiction under 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331. The court entered an order finally disposing of all claims against all parties on June 10, 2024. A786. Appellant timely appealed on July 2, 2024. A817. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE STATEMENT

1.    Whether the district court erred in holding that the Plans forbade termination by converting lifetime annuities to an actuarially equivalent lump-sum payment.

3

2.    Whether the district court abused its discretion by ordering additional benefits payments and prejudgment interest inconsistent with plaintiffs' untimely amended theory of liability.

## STATEMENT OF THE CASE

### A.    Legal background

This case concerns an employer-sponsored retirement benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA). ERISA is a "comprehensive and reticulated statute" designed "to ensure that employees … would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984).

When Congress enacted ERISA, it "did not *require* employers to establish benefit plans." *Conkright v. Frommert*, 559 U.S. 506, 516 (2010) (emphasis added). Yet Congress "repeatedly expressed [its] intent to encourage the maintenance of pension plans." *Nachman Corp. v. Pension Benefit Guarantee Corp.*, 446 U.S. 359, 385 n.35 (1980). Thus, to promote the availability and sustainability of pension plans, ERISA represents a "'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481

4

U.S. 41, 54 (1987)).

A driving "congressional purpose[]" behind ERISA was to ensure that plans' "litigation expenses" would not "unduly discourage employers from offering [ERISA] plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). ERISA "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush Prudential HMO v. Moran*, 536 U.S. 355, 379 (2002).

One type of retirement plans employers offer are so-called top-hat plans. "A top hat plan is 'a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006) (quoting 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1)). Top-hat plans are generally subject to ERISA. 29 U.S.C. § 1003(a). But they are excluded from "many individual ERISA provisions on the basic assumption that high-level employees are in a 'strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees.'" *Holloman*, 443 F.3d at 837 (quoting *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001)); *see* Dep't of Labor, *Pension &*

5

*Welfare Benefit Programs*, Op. Ltr. 90-14A, 1990 WL 123933, at *3-*4 (May 8, 1990).

Top-hat plans, for example, need not comply with ERISA's vesting or funding provisions and are exempt from ERISA's anti-alienation and fiduciary-responsibility provisions. 29 U.S.C. §§ 1051(2), 1056(d)(1), 1081(a)(3), 1101(a)(1).

## B.    Factual background

**1.** NCR[1] is a computer hardware, software, and electronics company that manufactures self-service kiosks, point-of-sale terminals, automated teller machines, check processing systems, and barcode systems—among other products. As a large employer, NCR offers a variety of retirement plans to its employees.

This appeal arises from a class action brought by participants, former participants, and beneficiaries of five "top hat" plans sponsored by NCR: the Senior Executive Retirement, Death, and Disability Plan (SERP I); the Retirement Plan for Officers of NCR (SERP II); the NCR Nonqualified Excess Plan (Excess Plan); the NCR Mid-Career Hire Supplemental Pension Plan

---

[1]   In 2023, NCR Corporation effected a division into two companies: NCR Atleos Corporation and NCR Voyix Corporation. This did not affect the proceedings below and does not impact this appeal because the Administrator is the only defendant remaining in this case. A084. For simplicity and consistency with the proceedings below, we refer to NCR as a unified entity throughout.

(Mid-Career Plan); and the NCR Supplemental Pension Plan for AT&T Transfers (AT&T Transfer Plan). A737.[2]

Each of NCR's Plans was intended to "provide for the payment of supplemental retirement, death, and disability benefits to senior executives of NCR in order to attract and retain executives of superior ability, industry, and loyalty."A737. The benefit under each plan was a lifetime annuity—a set periodic payment from NCR for life—based on the participant's compensation and tenure at NCR. A069.[3]

Each of the Plans provides the relevant plan administrator with the right to amend, modify, or terminate the plan at any time. A740. The SERP plans, for example, stated that the administrator "shall have the right … to amend or modify the Plan … or to terminate or repeal the Plan or any such agreement entirely at any time." *Id.* This unilateral right was subject to only one relevant restriction: "no such action shall adversely affect any Participant's, former Participant's, or Eligible Spouse's accrued benefits prior to such action under the Plan." *Id.*

---

[2]   The SERP plans designated the NCR Board of Directors as plan administrator; the others designated NCR. A067. In October 2012, the Plans were amended to all have the same Administrator, the defendant-appellant here. R.136-1:6-7.

[3]   NCR froze accruals of additional benefits under the Plans in 2006. A739. The benefits relevant to this case are those earned under the Plans as of December 31, 2006. *Id.*

**2.** During the 2008 financial crisis, NCR's pension liabilities exceeded its market capitalization. R.136-2:20-21.[4] NCR began to explore the possibility of terminating its ongoing obligations under the Plans by borrowing enough money to remove the annuities from its books. A739-740. It hired Towers Watson in May 2011 to examine the company's options, and Towers Watson emphasized NCR's ability to terminate the annuities by the payment of actuarially equivalent lump sums. R.150-13:28. NCR also heard from several other consultants that provided various options, including paying lump sum settlements, purchasing various types of replacement annuities from private vendors, or creating a "rabbi trust." A740-745. Ultimately, the NCR Compensation and Human Resources Committee (the Committee) unanimously voted that the lump-sum settlement payout would not "adversely affect" any accrued benefit. A747.

The Administrator was then tasked with reviewing NCR's proposal for consistency with the Plans. After that review, the Administrator elected to proceed with the option of paying a lump sum equal to the actuarially equivalent value of the NCR annuity held by each participant or beneficiary. The Administrator based this decision on presentations from consultants (A746-747); advice of outside counsel that replacing ongoing NCR annuities

---

[4]  Citations directly to the district court's docket are cited R.X:Y, where X is the docket number and Y is the page or paragraph number.

with an actuarially equivalent lump-sum payment "is reasonably construed as providing the full benefit entitlement under the Plans provided the lump sum payment is the actuarial equivalent of the annuity benefit" (A747); and the Administrator's own analysis. The Administrator therefore proceeded with creating the framework for ascertaining the appropriate actuarially equivalent lump sums.

To determine the lump sum actuarially equivalent to a given annuity "requires determining the pensioner's life expectancy from a mortality table and then applying a discount rate to the annuity payments that the participant would receive each year until his expected year of death (per the mortality table)." *Call v. Ameritech Mgmt. Pension Plan*, 475 F.3d 816, 817 (7th Cir. 2007).

> The discount rate converts the stream of expected future payments into a present value, which is the amount of the lump sum. The longer a person's life expectancy, the greater the value of an annuity to him (because it will be received, on average, for more years) and hence the larger the actuarially equivalent lump sum will be as well, since it is merely the discounted present value of the annuity. But the higher the discount rate, the lower the value of the annuity and hence the smaller the lump sum. A higher discount rate, as the term "discount" implies, reduces the value of future receipts (they are "discounted" more) and hence the present value of those receipts, which is the lump sum. Thus the discount rate and the mortality table jointly determine the lump-sum equivalent of the annuity to which the pension plan entitles the plan participant.

*Id.*

9

In terminating NCR's ongoing annuity liability, the Committee suggested use of 5% discount rate to calculate the appropriate lump sums. Towers Watson suggested a discount rate between 5.25% and 10%. R.150-13:41. Another consultant, Aon Hewitt, similarly suggested a 5.25% discount rate. R.150-13:42. NCR management selected a lower discount rate (resulting in higher lump-sum payments) based on the market-determined interest rate on NCR's most recently issued ten-year bond. R.136-2:28-29. Management also recommended using the Retirement Plan-2000 white collar mortality table. R.150-13:48-49.

After receiving the proposal from NCR's management, the Administrator met multiple times to consider the path forward. R.150-13:50-53. It heard from advisors from Atlas Advisors, J.P. Morgan, and Aon Hewitt, each of whom agreed that a 5% discount rate was appropriate given that it matched the current rate of an unsecured obligation of NCR and was the rate at which the ten-year bond was trading. *Id.* Aon Hewitt's summary reflects that the 5% rate matched the unsecured nature of nonqualified plan benefits, accorded with the rate used to discount NCR's unsecured cashflows, and was consistent with NCR's long-term debt rate. R.150-13:48.

The Administrator voted unanimously that a 5% discount rate would yield actuarially equivalent lump sums, and that those lump sums were consistent with the terms of the Plans. R.150-13:53. The Administrator also

reviewed the proposed mortality tables and made a participant-friendly alteration: Rather than using a single proposed table, the Administrator determined that it would be fair and reasonable to use the more favorable value from two different mortality tables. R.150-13:55.[5] The Administrator thus voted to move forward with termination.

On February 25, 2013, the Plans were terminated. Lump-sum payments were distributed between June 2013 and June 2014. R.150-13:56-58.

### C.    Procedural background

Plaintiffs, who are participants in, former participants in, or beneficiaries of the Plans, sued in November 2015 naming NCR Corporation, the Compensation and Human Resources Committee, Andrea Ledford, and the Administrator as defendants. A750. The original complaint alleged three claims: Count I asserted that NCR improperly removed the trustee of the SERP plans; Count II alleged that NCR breached the Plan agreements by paying lump sums discounted at 5%; and Count III alleged that NCR breached the Plan agreements by interpreting "eligible spouse" to include only spouses who were married to participants both when the benefits accrued and at the time of distribution. A750-751.

**1.** Defendants moved to dismiss, and the district court granted in part. A066. Because the Administrator was the only appropriate defendant, the

---

[5]   Plaintiffs did not challenge the mortality assumptions NCR used.

court dismissed NCR Corporation, the Committee, and Ms. Ledford as defendants. A105-106. The court further dismissed Count III (concerning spousal benefits) for lack of standing. *Id.* But the court denied the motion to dismiss as to Counts I and II. *Id.*

Plaintiffs filed their first amended complaint in December 2016, adding additional named plaintiffs to pursue the spousal-benefits claim. R.34. Defendants again moved to dismiss, and the district court denied the motion. A751.

The court also granted in part plaintiffs' motion for class certification and certified a class of "participants, former participants, beneficiaries and spouses or eligible spouses" in the Plans "who received or were entitled to receive lump sum payments from NCR as a result of the termination of NCR's nonqualified plans" for purposes of Count II. A260. The court certified a subclass to adjudicate the SERP trust claim (Count I) (*id.*) but did not certify a class as to the spousal benefit claim (Count III) (A261).

Plaintiffs' second amended complaint added an additional spouse as a plaintiff. R.86. The parties briefed motions for summary judgment on the spousal benefits claim, and the district court granted summary judgment in plaintiffs' favor of plaintiffs on Count III. A342.

**2.** With Count III adjudicated and discovery complete, the parties cross-moved for summary judgment on Count II, concerning NCR's use of a

5% discount rate to calculate the lump sums. R.136; R.151.

In their cross-motion for summary judgment—filed nearly five years into this litigation, after the close of discovery, and more than four years after the deadline to amend pleadings (R.20)—plaintiffs changed their liability theory entirely, arguing for the first time that the Administrator breached the Plan agreements because it lacked authority to convert the annuities to lump sums *at all*. R.151.9-7. The district court agreed that plaintiffs' theory of the case had "morphed." A546. It therefore ordered supplemental briefing to address whether it could consider the new theory on summary judgment (A549-550). After supplemental briefing, the district court held that plaintiffs could present their new theory, provided that they file an amended complaint. A554. Plaintiffs filed a third amended complaint, reworking their theory of the case to focus on the conversion of the annuities to lump sums rather than use of the 5% discount rate to calculate the actuarially equivalent lump sum. A556.

The district court denied the Administrator's requests for additional discovery to address the fundamental change in plaintiffs' theory and for plaintiffs to be required to redo class certification with the revised theory of the case. A637.

**3.** The district court held argument on the pending cross-motions for summary judgment on liability in August 2023. R.223. The court denied the

Administrator's motion and granted plaintiffs' cross-motion. Reviewing the operative fourth amended complaint,[6] the district court framed plaintiffs' primary argument as "that the Plans prohibited Defendant from settling its obligations by paying 'lump sums,' i.e., sums calculated by using a set of actuarial assumptions such that the lump sums were, in theory, actuarially equivalent to the present value of the life annuities." A761. After the late amendment to change their liability theory, plaintiffs' secondary argument was "that, even if the Plan permitted Defendant to convert Plaintiffs' life annuities to actuarial equivalent lump sums, the Plan did not permit Defendants to discount those lump sums based on NCR's default risk on the market." A761-762.

The court began by stating its standard of review. It explained that it "conducts its review *de novo*" because the dispute turned on interpretations of the Plan language. A759-760. The court construed the Plan terms, and where ambiguous, construed them against the Administrator as the drafter of the Plan language. A759. It rejected the Administrator's suggestion that the contractual provision delegating interpretive authority to the Administrator required deference to the Administrator's interpretations. A758-760.

---

[6]  During summary-judgment briefing on count II, the parties "fully resolved the dispute addressed in the spousal claim." A754. Plaintiffs thus filed the operative fourth amended complaint (A657) containing only Counts I and II.

14

Analyzing the Plan language, the district court recognized that "[t]he Plans … did provide Defendant with the right to *terminate* the plans 'entirely at any time.'" A763. "In light of this language, Defendant was clearly permitted to terminate the Plans." *Id.* But the court nonetheless held that the Administrator was *not* "permitted to unilaterally convert the promised fixed life annuity benefits to actuarially equivalent lump sum payments upon Plan termination." A764.

In reaching that conclusion, the court rested on the absence of express authorization in the Plans to accelerate payments. A764-765. It concluded that the right to terminate does not *necessarily* entail the right to convert to an actuarially equivalent lump sum, based largely on NCR having considered other options when assessing whether and how to end its annuity obligations. A765-766. And the court gestured to other language in the Plans—the Plans' commitment to provide lifetime annuities—that it claimed supported plaintiffs' reading. A766-767.

The district court then turned to the question of whether conversion of an annuity to a lump sum "adversely affected" the accrued benefits. A769-770. Plaintiffs argued that lump-sum payments differ from annuities in both "longevity risk" (i.e., the risk that a beneficiary will outlive their assets) and "investment risk (i.e., the risk that a beneficiary will fail to earn a sufficient investment return to fund retirement). A771. The court determined

15

that annuities minimize both types of risk for participants, and that NCR thus adversely affected the benefit by terminating the annuities and shifting these risks onto participants. A771-772. It reasoned that "a life annuity and a lump sum payment are fundamentally different instruments, rather than interchangeable ones." A773. It rejected the Administrator's contrary arguments and held that under "the relevant words and provisions in the Plans … Defendant was not permitted to unilaterally convert Plaintiffs' promised life annuities to actuarially equivalent lump sums." A780.

After twenty pages of analysis on plaintiffs' first theory, the district court devoted two paragraphs to their second—that NCR was not allowed to apply a 5% discount rate. The court summarily held for the plaintiffs, because "(1) nothing in the Plans permitted Defendant to reduce Plaintiffs' benefits based on NCR's default risk and (2) Defendant's use of a 5% discount rate undoubtedly 'adversely affected' Plaintiffs' and other class members' 'accrued benefits' by providing them a benefit of lesser value than the benefits to which they bargained for and were entitled." A781-782.

**4.** After finding liability in plaintiffs' favor, the district court ordered further briefing on the appropriate remedy. A783-784. Plaintiffs requested that the court order the Administrator to provide additional payments equal to the difference between the amount required to purchase the same annuity on the private insurance market and the lump-sum payments NCR had

16

already provided. A793. The Administrator, however, proposed that a reasonable remedy given the court's holding that the Plan did not authorize conversion of annuities to lump sums was to simply reinstate the annuities, adjusted for the lump sums NCR had already paid. R.232:9.

The district court rejected the Administrator's proposal. It stated that it does not "make any sense for the Court to order NCR to reinstate the Plans and annuities (thereby treating them as having never been terminated)" because plaintiffs were not challenging the Administrator's right to terminate the plan. A794. Instead, they challenged the form (or size) of the replacement benefit the Administrator provided when it *did* choose to terminate the plan. *Id.* The court further claimed that the Administrator's proposal is "unworkable" because it would "involve complicated and disputed calculations." A794-795 n.4.

The court thus granted plaintiffs' requested form of relief, ordering the Administrator to provide additional payments based on the Pension Benefit Guarantee Corporation (PBGC) mortality assumptions for 2013 to "arrive at a present value of the terminated annuity that reflects the average price to purchase a replacement annuity in the private insurance market." A797-798. The court awarded prejudgment interest, despite that plaintiffs had received *more* benefits up front (via lump sum) than they were entitled to (smaller regular annuity payments) under the court's construction.

17

A802. And the court awarded post-judgment interest with interest compounding annually. A809-810.[7]

The Administrator timely appealed. A817. It sought to stay enforcement of the judgment pending appeal and asked plaintiffs to waive the requirement under Federal Rule of Civil Procedure 62 that NCR post a bond. R.245:¶6. Plaintiffs, however, declined. *Id.* The parties therefore negotiated a bond backed by a surety, which the district court approved, to stay the judgment below while this Court resolves the Administrator's appeal. R.246.

## SUMMARY OF ARGUMENT

The district court's holdings on liability and remedy were each error.

**I.** The Administrator appropriately terminated the Plans and paid to participants a lump sum that was actuarially equivalent to the value of the NCR-backed annuity plaintiffs held. The district court's summary judgment to plaintiffs must be reversed.

**A.** The district court's conclusion that the Plans *foreclosed* paying an actuarially equivalent lump sum upon termination finds no support in the Plans' language. As a threshold matter, the court should never have reached this question because plaintiffs did not assert this claim until summary

---

[7] Because plaintiffs sought no additional relief under Count I, and because "Count I ultimately seeks the same relief as Count II," the court decertified the Count I class and dismissed Count I without prejudice. A812.

judgment. But the district court reached the wrong result in any event—the Plans unambiguously allows the Administrator's chosen course of paying an actuarially equivalent lump sum.

While the Administrator's interpretation of the Plans is the best (indeed, only) one, the district court also stopped its analysis too early. After noting its *de novo* disagreement with the Administrator's decision, the district court ended the inquiry, disregarding this Court's well-established framework requiring a multi-tiered review affording deference to an administrator who has express discretionary authority under the Plans. Here, the Administrator's approach was at least a *reasonable* one. That is all the Administrator needed to show for its decision to be upheld.

**B.** The same applies to the Administrator's use of a 5% discount rate. The district court failed to recognize that an annuity from NCR is subject to NCR's risk of default. Such an annuity is thus necessarily worth *less* than an annuity from a private insurer. There is no question that the Administrator must use *some* discount rate, and its decision to incorporate NCR's default risk into that discount is fully consistent with the Plans' language.

**II.A.** The district court erred in awarding plaintiffs a remedial windfall inconsistent with their own theory. The court held that the Plan prohibited payment of lump sums in place of annuities and emphasized language stating that participants "shall" receive benefits in the form of annuities.

19

The Administrator offered to fully remedy any error by reinstating the annuities with adjustments made for missed payments. The court's rejection of that superior proposal—the only one that actually addressed its holding—was reversible error.

**B.** The district court's award of prejudgment interest is indefensible. Plaintiffs' new liability claim was that they were entitled to annuities—i.e., that they were paid *too much*, *too quickly*. If NCR had to continue providing annuities, as plaintiffs suggest, then the harm is that plaintiffs received money immediately that they should not have received for years. Prejudgment interest is inappropriate in such circumstances.

## STANDARD OF REVIEW

The Court reviews the district court's rulings on the cross-motions for summary judgment *de novo*. *Goldfarb v. Reliance Standard Life Ins. Co.*, 106 F.4th 1100, 1105 (11th Cir. 2024). In reviewing the Administrator's interpretations of the Plan, the Court applies deferential review asking principally whether the Administrator's interpretation was reasonable. *Id.*

The Court reviews the district court's decision to allow a post-discovery, post-summary-judgment amendment to the complaint for abuse of discretion. *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (per curiam). The same is true for the Court's review of the remedies the district

court fashioned, including its decision on prejudgment interest. *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1325 (11th Cir. 2004).

## ARGUMENT

## I.  THE PLANS AUTHORIZE TERMINATION OF ANNUITIES BY PAYING THE LUMP SUMS THE ADMINISTRATOR SELECTED.

The district court fatally erred in concluding that the Plans did not permit conversion of the annuities to lump sums upon plan termination. Both its methodology and conclusions were irredeemably flawed. It disregarded precedents from the Supreme Court and this Court, overrode the Plans' grant of interpretive authority to the Administrator, overlooked the evidence in the record concerning the effects of such a conversion, and confused the concepts of benefit *value* and benefit *payments*. The Court should reverse.

### A.  The Plans permit converting annuities to actuarially equivalent lump sums upon termination.

The principal theory on which plaintiffs prevailed below was that the Administrator breached Plan terms by converting annuities to lump sums upon termination. The court never should have allowed plaintiffs to pursue this late-breaking theory in the first place. But the reason it arose so late is obvious—it is wrong. The Plans clearly and unequivocally provide a right to terminate them, and nothing in the Plans forbade converting the annuities into an appropriately calculated lump sum reflecting the annuities' present-

day value. The district court's granting of summary judgment to plaintiffs on this theory was procedurally improper and substantively wrong.

### 1.    The district court erred in allowing plaintiffs' untimely claim challenging the use of lump sums.

From the start of this case, plaintiffs challenged the Administrator's use of a 5% discount rate to calculate the lump-sum payments. At summary judgment, however, plaintiffs shifted their theory of the case dramatically—to newly contend that the plan forbade conversion of annuities to lump sums *entirely*. The district court recognized that plaintiffs' allegations were "entirely different" (A546), but authorized plaintiffs to amend their complaint (despite the long-passed amendment deadline) to press the theory.

Although district courts can allow plaintiffs to amend complaints when justice so requires (Fed. R. Civ. P. 15(a)(2)), that liberal standard is qualified by Rule 16(b), which requires courts to "issue a scheduling order" that "limits the time to … amend the pleadings." When a plaintiff's proposed amendment post-dates a court-ordered deadline for amending pleadings, the plaintiff must also demonstrate "good cause" for amending the scheduling order. *Id*.; *Sosa*, 133 F.3d at 1418.

Despite that the Administrator set forth the appropriate standard (at R.190:20), the district court nowhere conducted Rule 16's "good cause" analysis. It is beyond cavil that "[a] district court abuses its discretion if it applies an incorrect legal standard." *Diveroli v. United States*, 803 F.3d 1258,

22

1262 (11th Cir. 2015). Beyond this fundamental legal error, neither justice nor good cause could possibly have permitted the change the district court allowed.

*First*, plaintiffs' late change could not satisfy the Rule 16(b) standard. Unsurprisingly, the district court did not address it. This Court has explained that Rule 16 "precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa*, 133 F.3d at 1418 (quoting Fed. R. Civ. P. 16, advisory committee note to 1983 amendment). Plaintiffs came nowhere close to such a showing.

Plaintiffs' argument was that they did not need to amend their complaint to assert a radically new claim and theory of relief at the summary judgment stage, an argument the district court correctly rejected. This Court has been clear that "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Colardo-Keen v. Rockdale Cnty., Ga.*, 775 F. App'x 555, 571-572 (11th Cir. 2019) (affirming rejection of changed theory of county's liability at summary judgment); *Mena v. McArthur Dairy, LLC*, 352 F. App'x 303, 308 (11th Cir. 2009) (affirming rejection of minimum-wage and straight-time pay claims where plaintiff alleged unpaid overtime).

Instead, "[t]he proper procedure" to assert a new claim is "to seek to amend [the] complaint." *Gilmour*, 382 F.3d at 1315. Plaintiffs never moved to amend the complaint to assert this new theory *at all*. That position was untenable: "It is well settled that '[a] plaintiff may not amend [its] complaint through argument in a brief opposing summary judgment.'" *Varazo v. Keiser Corp.*, 754 F. App'x 918, 919 (11th Cir. 2018) (quoting *Gilmour*, 382 F.3d at 1315).

As a fallback, plaintiffs asserted that they only became aware of their new claim after discovery. That contention makes little sense when plaintiffs' newly-minted position was that the contract unambiguously foreclosed lump-sum payment. Regardless, as the Administrator pointed out, it produced the documents plaintiffs cited no later than August 11, 2017. R.190:20 n.17. And the Administrator's *last* discovery production was in June 2019, four months before opening expert reports. R.190:21. Plaintiffs' new theory appeared in a summary-judgment opposition in April 2020. Plaintiffs thus waited *years* before even arguably requesting to assert this new theory. This Court has recognized that far shorter delays are inconsistent with the diligence Rule 16 requires. *Sosa*, 133 F.3d at 1419 (no good cause where plaintiffs waited six months to request leave to amend based on information obtained in discovery); *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (three months). Plaintiffs

24

have never justified their delay, nor did the district court explain why it would be justifiable considering courts' rejection of much shorter delays.

*Second*, plaintiffs' untimely amendment allowed them to subvert the "strict[]" ERISA exhaustion requirement. *Perrino v. S. Bell Tel. Co.*, 209 F.3d 1309, 1316 (11th Cir. 2000). At the motion to dismiss stage, the district court found that plaintiffs had alleged exhaustion on their initial theory and excused the failure to exhaust additional remedies as futile. A077-078. But plaintiffs made *no* attempt to exhaust their new theory. And it would be a mistake to assume futility just because the Administrator had made a decision; in this Circuit, exhaustion is "strictly enforce[d]." *Perrino*, 209 F.3d at 1316. Allowing plaintiffs to circumvent this requirement defeats the purpose of exhaustion, including "minimiz[ing] the cost of dispute resolution … and allow[ing] prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually litigated." *Mason v. Cont'l Grp., Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985).

*Third*, the late change materially affected class certification. As the district court explained, the issues plaintiffs identified as common to the class all concerned the discount rate the Administrator chose; none concerned whether the Plan authorized that course of action in the first place. A648. When the district court certified the class, it explained that "at the

25

heart of these claims [was] whether the 5 percent discount rate … was actuarially equivalent to [participants'] accrued benefits." A241. The "ultimate issue," under plaintiffs' original theory, was "whether or not the Administrator, after terminating the plans, improperly determined the discount rate for the purpose of calculating the amounts it owed to plan participants and other class members." A254. But the question of whether conversion of an annuity to a lump sum *itself* adversely affects an accrued interest is analytically distinct from whether the choice of a higher-than-appropriate discount rate would. *Holloman*, 443 F.3d at 839 (analyzing the questions distinctly).

*Fourth*, plaintiffs' choice to spring their new theory on the Administrator at summary judgment caused unfair surprise and delay. While plaintiffs sought discovery on the cost of replacement annuities and their experts used this data to argue the discount rate should have been less, the Court has rejected the premise that "the introduction of evidence arguably relevant to pleaded issues" can ever "serve to give a party fair notice that new issues are entering the case." *Doe #6 v. Miami-Date Cnty.*, 974 F.3d 1333, 1339 (11th Cir. 2020). Relying on plaintiffs' pleadings, the Administrator reasonably obtained expert opinion and crafted its summary judgment ar-

guments around the actual claims in the case. The district court compounded this prejudice when it denied leave for additional discovery and further briefing on the effect of the change on the case. A637.

"The principal test for prejudice" in situations like this "is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory." *Evans Prods. Co. v. W. Am. Ins. Co.*, 736 F.2d 920, 924 (3d Cir. 1983). This Court has recognized that amendment after the close of discovery and after a defendant has moved for summary judgment would "cause[] the defendants undue prejudice, as they would not have been able to conduct further discovery with respect to the claim the proposed amendment asserted." *Reese v. Herbert*, 527 F.3d 1252, 1263 (11th Cir. 2008). The district court's unsupported assertion to the contrary failed to reckon with the appropriate standard.

The district court never should have allowed plaintiffs to pursue this tardy theory—reason alone to reverse summary judgment on the theory.

### 2. *The Plans unambiguously authorize conversion of annuities to lump sums as part of termination.*

Plaintiffs' late-breaking construction of the Plans is also wrong. The Plans are unambiguous: the Administrator could "terminate or repeal" the plans "entirely at any time," subject to only one relevant restriction: it could not "adversely affect" any participant's "accrued benefits." A740. The dis-

27

trict court's conclusion that the Plans unambiguously *foreclosed* the Administrator from terminating the annuities by paying lump sums nowhere follows from the Plan language, and this Court has rejected the notion that converting an annuity to a lump sum categorically adversely affects a benefit. By authorizing plan termination and giving the Administrator binding authority to interpret the Plans, the Plans unambiguously authorize the approach the Administrator selected.

> **a.    The right to terminate an ongoing stream of payments inherently includes the ability to provide a lump sum.**

Each Plan authorized the Administrator to terminate, repeal, amend, or modify the Plan at any time. A740. This carries with it the authority to terminate the Plan by payment of a lump sum. After all, the very *point* of a plan termination is to end the plan as a go-forward concern.[8]

**i.** Relevant regulations confirm this basic observation. The Internal Revenue Service has promulgated detailed rules for terminating noncovered ERISA plans like those here. 26 C.F.R. § 1.409A-3. "A plan may provide for the acceleration of the time and form of a payment, *or a payment under such plan may be made*, where the acceleration of the payment is made pursuant

---

[8]    As one of NCR's experts explained, this and similar language appears in numerous ERISA plans and is "widely understood in practice" to allow termination by conversion to lump sums. R.136-7:¶48.

to a termination and liquidation of the plan." *Id.* § 1.409A-3(j)(4)(ix) (emphasis added). In situations like the Plans' termination here, payments must be distributed with 24 months of the date the Administrator "takes all necessary action to irrevocably terminate and liquidate the plan." *Id.* § 1.409A-3(j)(4)(ix)(C)(4). But so long as a plan administrator complies, she is certainly *authorized* to take the approach the Administrator chose here.

The district court focused principally on "what language *is not* in the Plans"—that is, that "the Plans include no language stating that [the Administrator] may convert the promised life annuities to lump sums or otherwise accelerate the payment of benefits, as in some cases." A764. This is a puzzling line of reasoning given that the Administrator is permitted to amend the Plans at any way, at any time, and could have added an acceleration clause subject only to the restriction that it cannot adversely affect accrued benefits. *See Holloman*, 443 F.3d at 383. But in any event, the Administrator need not have done so. The IRS regulation contemplates an Administrator making accelerated payments if a Plan provides for acceleration *or* upon termination. 26 C.F.R. § 1.409A-3(j)(4)(ix). If acceleration were permitted only when the plan expressly provided, the rule's "where the acceleration of the payment is made pursuant to a termination and liquidation of the plan" would be rendered completely superfluous. *Id.*; *see also Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008).

This regulatory background underscores that the district court got its analysis backwards. Given the default assumption that a plan *may* accelerate on termination, the relevant consideration is whether any Plan provision *prohibits* such an approach to termination. Neither the district court nor plaintiffs has identified such a prohibition—because there is none. This is critical given the Plans' grant of binding interpretive authority to the Administrator. *See* pages 39-40, *infra*. Absent a prohibition and given the Plans' delegation of interpretive authority, the court was wrong to reason that the absence of a specific authorization in the Plan documents unambiguously establishes a lack of authority.[9] It is exactly the opposite: by not expressly foreclosing the Administrator's course of action, the Plans unambiguously *authorize it*. At least two district courts have read *Holloman* as aligned with this precise proposition—including a court reviewing the exact

---

[9] The district court's focus on other potential "options of how to settle participants' 'accrued benefits' upon Plan termination" was similarly misguided. A765. While the Plans may not *require* settlement by actuarially equivalent lump sums, they nowhere foreclose it. *Accord Starr v. MGM Mirage*, 2008 WL 11451257, at *6 (D. Nev. 2008) ("MGM could have purchased a 20-year annuity for Plaintiff, but the issue before the Court is whether it was required to do so"). Nor is there any weight behind the district court's concern that the Plans do not provide the specifics to be used in determining actuarial equivalence. A766. Each Plan provided that the Administrator could adopt "such rules and actuarial tables as it deems necessary, desirable, or appropriate." A478, A493, A515, A526, A539.

same NCR plans as at issue here.[10]

The Plans' use of the word "shall" throughout is certainly not to the contrary. The district court emphasized that the Plan contains "provisions stating that the retirement benefits '*shall* be entitled to a benefit under this Plan expressed as a single life annuity.'" A766. But the district court's understanding of that language is facially incompatible with the Plans' language allowing termination. The Plans use "shall" often: "[t]he Plan *shall* be administered by the Administrator or its delegate;" retirement and termination benefits "shall be made" as of defined points in time; and participants "shall be entitled to receive disability benefits under the Plan" in the event of total disability. *See* R.151:13. Obviously, none of these conditions is even *possible* after the Plans terminate. The clear meaning is that the obligations that "shall" occur are required *so long as the Plans exist*. Contracts always have mandatory obligations—the point of terminating a contract is to end the contract's obligations. *E.g.*, *Silverpop Sys., Inc. v. Keading Market Tech., Inc.*, 641 F. App'x 849, 857 (11th Cir. 2016).

---

[10]  *See Taylor v. NCR Corp.*, 2015 WL 5603040, at *6 n.6 (N.D. Ga. 2015) ("The power to terminate a plan necessarily implies the power to pay out the benefit in a lump sum upon termination."); *Starr*, 2008 WL 11451257, at *7 (paying a "lump sum" in lieu of annuity upheld based on "absence of specific language to the contrary and on [the administrator's] authority to both interpret the Plan's terms and distribute benefits upon termination")

The district court recognized that at least some of the Plans' uses of "shall" must be read to terminate. A768 n.16. But it nonetheless concluded that a single provision—that the benefits "shall be paid for life"—overrode all else because the Administrator "could have purchased replacement life annuities." There is no reason why this lone instance of "shall" should be treated differently from the others, nor any compelling reason to reject the Administrator's understanding of "shall" that reads all Plan provisions in harmony. And the remainder of the court's holding makes no sense. It did *not* require the Administrator to continue to provide the benefit in the form of a life annuity. *See* pages 52-55, *infra*. Rather, it held that a permissible way to terminate the plan was to pay the participants a lump sum equal to the replacement cost of their annuities on the private market. That holding is irreconcilable with the court's understanding of this "shall" obligation requiring benefits "paid for life." Such an internally inconsistent reading of the Plan language cannot stand.

**ii.** The few out-of-Circuit cases the district court invoked cannot overcome the clear default that plan administrators vested with discretionary authority to wind up plans may do so by settling ongoing obligations in the form of lump-sum payments.

*Carr v. First Nationwide Bank*, for example, did not involve plan termination at all. 816 F. Supp. 1476, 1482-1484 (N.D. Cal. 1993). Instead, the

32

administrator attempted to use its unilateral authority to amend a plan's express provisions covering interest rates and payment schedules in a way that disadvantaged participants. *Id.* The court analyzed the plan's "shall" language to determine that the participants *were* entitled to certain benefits (with certain defined parameters). *Id.* at 1494. Given that the plan's grant of authority to amend was "clearly limited by language that prohibits 'canceling, reducing or altering any outstanding awards,'" the court concluded that the "short general provision stating that the Bank 'may' amend cannot operate to nullify" the Plan's other, specific obligations. *Id.* But *Carr* said nothing about termination, and nothing about amendments that did *not* negatively impact participants.

*Kemmerer v. ICI Americas, Inc.*, 70 F.3d 281 (3d Cir. 1995), is even farther afield. There, the Third Circuit held only that a top-hat plan administrator could not unilaterally terminate a plan where the plan did not provide for termination and instead provided that participants' right to payment was "irrevocable." *Id.* at 287-288. The court specifically observed that "nothing in ERISA prohibits the parties from contracting to limit the employer's right to amend or terminate a plan," as the parties there did. *Id.* at 288. Here, the plaintiffs have *not* challenged the Administrator's decision to terminate the plan; the Plans each plainly allowed that decision.

33

Much closer to home is *Taylor v. NCR Corp.*, 2015 WL 5603040 (N.D. Ga. 2015), interpreting one of the *same* plans at issue here. There, as here, the plaintiff did not "dispute that NCR had the right to terminate or amend the Plan." *Id.* at *6. And it rejected the argument that the conversion of the annuities to lump sums "was, in itself, improper because it amounted to a reduction of his future monthly payments under the plan." *Id* at *7. The court instead explained that the plaintiff must allege that the lump sum distribution "amounted to an *actuarial* reduction in … benefits," and that he had failed to do so. *Id.* at *8. That holding presupposed that NCR had a right to convert to lump sums in the first place; the same applies here.

### b.    Conversion from an annuity to an equivalent sum maintains the value of the benefit.

The Plans nowhere expressly prohibited settlement by providing actuarially equivalent lump sums. They did not *implicitly* prohibit this course either. The only relevant constraint on the Administrator's discretionary authority to terminate the plan is the prohibition on action that "adversely affect[s]" any participant's "accrued benefits." The district court's decision that conversion of a benefit from an annuity to a lump sum categorically "adversely affects" benefits is directly contrary to both this Court's decision in *Holloman* and the evidence in the summary judgment record.

**i.**  In *Holloman*, this Court considered the payment of lump sum distributions in two top-hat plans. 443 F.3d at 838-839. The Court affirmed the

34

district court's grant of summary judgment in favor of the plan administrator. *Id.* at 839. Like here, the "provisions in the plans that govern acceleration of payments and amendment and termination of the plans clearly specif[ed] that no acceleration, amendment, or termination may reduce the benefits payable to a plan participant." *Id.* Faced with such a provision, the Court explained that the inquiry was "whether the lump-sum payments were actually equivalent in value to the stream of future payments" the plaintiff was "to have received originally." *Id.*

The court rejected outright the plaintiff's argument that the use of an actuarially equivalent lump sum constituted a reduction in benefits. 443 F.3d at 840. "Discounting to present value is a standard way to account for the fact that a dollar amount to be received in the future is generally worth less than the same dollar amount received in the present." *Id.* The plaintiff there was "essentially saying that the value of any lump-sum payment had to exceed the value of the stream of future payments that it was meant to replace." *Id.* But by forbidding terminations that adversely affected benefits, "[t]he plan terms only required Mail–Well to pay the equivalent of Holloman's future payments. It surely did not require them to pay more than the value of Holloman's future payments." *Id.*

**ii.** The district court's holdings below are flatly inconsistent with *Holloman*. It emphasized two "core features of fixed life annuities": they "provide fixed income *for life*, mitigating the risk that participants will outlive their assets" ("longevity risk"); and they "provide a fixed return regardless of market conditions, mitigating the risk that participants will fail to earn a sufficient investment return to fund retirement" ("investment risk"). A771. It noted that where "a plan sponsor bears those risks, a beneficiary is afforded a sense of security that he will be provided with a set amount of money for the entirety of his life." *Id.* Because lump sums shift those risks to participants, the district court reasoned, the benefits were adversely affected. A772.

In *Holloman*, this Court explained that "[d]iscounting to present value is a standard way to account for the fact that a dollar amount to be received in the future is generally worth less than the same dollar amount received in the present." 443 F.3d at 840. But a dollar is worth more today than tomorrow precisely *because* of the shift in investment risk. Shifting the opportunity to earn a return on money now to participants thus does not remove any value from the underlying benefit. The district court's contrary holding would have made the Court's decision in *Holloman* impossible.

The district court's consideration of longevity risk fares no better. The lump-sum calculation that the Court held did *not* result in a reduction in

benefits in *Holloman* involved the use of a mortality table as well. 443 F.3d at 839. And while a discount rate recognizes the time-value of money, the mortality rate assumption recognizes that no one lives forever and the value of a future stream of benefits pegged to a participant's life depends on how long the participant is likely to live. Like the discount rate, the mortality assumption is necessary to ensure that lump-sum payments are "actually equivalent in value to the stream of future payments [the participant] was to have received originally." *Id.*

The district court's emphasis on the phrase that a termination may not "adversely affect" "*any*" participant's "accrued benefits" (at A769) disregards this Court's holding that the question is whether the *value* of the benefit changes, not whether any particular *person* might end up better or worse off by changing from a "stream of future payments" from NCR to an equivalent lump sum in the present. *Holloman*, 443 F.3d at 838-839. That is, the question is not whether the change could qualitatively affect a participant. The question is whether the change affects the "*accrued benefits*." The *benefits* have a calculable present-day value at the time of termination, and paying that amount is not adversely affecting the benefit. *Holloman* held as much: although that plan provided there could be "*no* reductions in benefits," the Court necessarily concluded that there *is not* a reduction in

benefits when the plan pays present-day value in lieu of the stream of future payments. 443 F.3d at 838-839.

Finally, it bears emphasis that the district court held exactly what *Holloman* prohibits. In refusing to allow any termination that shifted *any* type of risk from the Plans to the participants, the district court limited the Administrator's options to providing or paying for annuities purchased on the private insurance market. But there is no real dispute that a private annuity is worth more than an annuity from NCR, in part because the latter is subject to the risk that NCR will default. *See* A775. The district court rejected the notion that default risk was "an aspect of the fixed, static 'accrued benefits." But once again, the court confused how much participants were *paid* with the *value* of the benefit. Even plaintiffs' own experts agreed that default risk must be taken into account when discounting future cash flows to present value. R.157:26 & n.19.

By requiring the Administrator to provide a replacement annuity (or the cost thereof), the court was "essentially saying that the value of any lump-sum payment had to exceed the value of the stream of future payments that it was meant to replace." *Holloman*, 443 F.3d at 840. The Plans "surely did not require [the Administrator]" to do so. *Id.*[11] In short, there is

---

[11] Plaintiffs' "borrower-lender loan analogy" cannot withstand scrutiny. A781. A bank obviously considers a borrower's risk of default (through their credit score, for example) when determining the rate at which it will convert

simply no room for "disagree[ing]" that the Administrator's decision complied with the Plans' terms. *Blankenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

### 3. *At a minimum, the Administrator's interpretation is reasonable.*

As the foregoing discussion shows, the best and most straightforward reading of the Plans' termination language allows the Administrator to convert annuities to lump sums, so long as the two are actuarially equivalent. As in *Holloway*, the Court should end its inquiry there. 443 F.3d at 837 ("find[ing] it unnecessary to decide whether the district court should have applied a deferential standard of review or *de novo* review.") But, if there is any doubt, the Administrator's arguments at the very least demonstrate that the Plans were *ambiguous* on this question. And given the Plans' grant of binding interpretive authority to the Administrator, the district court cannot reject the Administrator's reasonable interpretation of the contested plan terms—even if it might have reached a different de novo decision.

**a.** To set the stage, it was uncontested before the district court that each of the Plans contained a provision giving the Administrator discretion

---

a lump sum (the loan amount) to a stream of future loan payments. But a borrower's ability to repay the loan early without paying the full amount of interest is a feature of the agreement with the bank. That ability is a recognition that the value of the principal today is equivalent to the value of the principal plus interest in the future.

to bindingly interpret Plan terms. Earlier in this case, the district court it-self recognized that the Plans stated that interpretations were "subject to the sole discretionary authority of the Administrator." A405.

Each Plan at issue provided its administrator with sole interpretive authority in one of two formulations:

- SERP I & SERP II: "The Committee is authorized … to make such determinations and interpretations and to take such actions in connection with the Plan or the benefits thereunder as it deems necessary or advisable. All such determinations, interpretations, and actions by the Committee under the Plan or with respect to any benefits thereunder shall be final and binding on all persons." A415, A429-430.

- Excess, Mid-Career, & AT&T Transfer Plans: "The Company shall have all powers necessary or appropriate to carry out its duties including the discretionary authority to interpret the provisions of the Plan and the facts and circumstances of claims for benefits. Decisions of the Company shall be final and binding on all parties." A450, A459, A470.[12]

The Supreme Court has made clear that "a deferential standard of review" applies to discretionary decisions by a plan administrator. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989). Building on the Supreme Court's instructions, this Court has established a six-step "framework for courts reviewing an ERISA plan administrator's benefits decisions":

---

[12] Later versions of the Plans used similar language. A477, A492, A515, A525, A538.

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.

**b.** Rather than apply this Court's multi-layered, deferential standard for the review of discretionary Administrator decisions, the district court engaged only in a (fatally flawed) *de novo* interpretation of the Plans' language. A760. That deviation was inconsistent with this Court's and the Supreme Court's precedents.

In departing from this Court's well-hewn approach to reviewing plan administrators' plan interpretation, the district court relied on *Holloman*,

41

where this Court explained that it was "unnecessary to decide whether the district court should have applied a deferential standard of review or *de novo* review" because "all of the questions … turn on interpretation of what the plain terms of the plans permit and require." 443 F.3d at 837. But *Holloman* was a case where this Court *upheld* a plan administrator's decision. *Id.* at 842. Such a case is appropriately resolved at step one of the *Blankenship* analysis because the court agreed with the administrator's interpretation or decision. *Blankenship*, 644 F.3d at 1355. That is not true where step one goes *against* the administrator, which is what happened below. Indeed, that is the entire purpose behind the additional steps. That is why in *Holloman* it was unnecessary to determine whether a more lenient standard was required—because the more stringent standard was satisfied. It is inappropriate to extend that holding to mean that courts can apply the more stringent standard *only*.[13]

---

[13]  Though the district court noted in passing that counsel for the Administrator urged the case be resolved at the *de novo* review step, that is no concession. A760 n.11 (quoting A732-733). Instead, counsel was arguing that the Plans unambiguously authorized the Administrator's interpretation. The rest of that exchange is clear that if the court disagreed, it "would need to conduct another round of analysis under [the] abuse of discretion standard." A733; *accord* A732 ("And so the Court would need to do an abuse of discretion analysis."). That is exactly the approach that this Court requires, and the same argument the Administrator advances on appeal.

Beyond its misreading of *Holloman*, the district court offered no authority for the proposition that its inquiry ends once it has construed the Plan language. Nor is there any. For their part, plaintiffs urged this approach based on the Third Circuit's decision in *Goldstein*. 251 F.3d 433. There, the court held the "deferential review for the discretionary decisions of administrators to be inapplicable" in the context of top-hat plans. 251 F.3d at 442-443. But the *Goldstein* court emphasized that "in the case of a top hat plan, even though an administrator may not receive 'deference' under *Firestone*, any grant of discretion must be read as part of the unilateral contract itself." *Id. at* 444. And "[a]s a term of the contract, it must be given effect as ordinary contract principles would require." *Id.* The "de novo" review the Third Circuit discussed is simply "the authority to conduct a de novo review as to whether a party has *complied with its good-faith obligations*" where the contract gives it discretion. *Id.*

Thus, as the Third Circuit has later clarified, "[u]nder *Goldstein*, a plan administrator's interpretations of ambiguous terms are given deference, subject to the covenant of good faith and fair dealing, if the plan in question includes a grant of discretionary authority." *Zebrowski v. Evonik Degussa Corp. Admin. Comm.*, 578 F. App'x 89, 93 (3d Cir. 2014). The only requirement is thus that the Administrator's decision be "reasonable." *Goldstein*, 251 F.3d at 444. The district court's analysis does not even *mention*

43

the word "reasonable" outside the standard of review, instead concluding that "the Plan language, viewed as a whole, supports Plaintiffs' reading." A775. But "[d]eferential review does not involve" just "a construction of the terms of the plan; it involves a more abstract inquiry—the construction of someone else's construction." *Morton*, 91 F.3d at 871 n.1. The district court erred by shortcutting the required analysis.

Though the Third Circuit's approach cannot justify what the district court did below, it is worth pausing to note that, in any event, it is inconsistent with Supreme Court precedent. "*Firestone* [489 U.S. 101] tells us that a contract conferring interpretive discretion must be respected." *Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011). "To hold, as *Goldstein* does, that non-fiduciary status *requires* independent judicial decisions, *despite* a contract, is to turn *Firestone* on its head." *Id.*; *see also Sznewajs v. U.S. Bancorp Amended & Restated Supp. Benefits Plan*, 572 F.3d 727, 733 (9th Cir. 2009), *overruled on other grounds*; *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 108 (2d Cir. 2008). The First, Fourth, and Eighth Circuits have similarly held that "where one party is granted discretion under the terms of the contract," such discretion need only "be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably." *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006); *Bender v. Xcel Energy, Inc.*, 507 F.3d 1161, 1167 (8th

Cir. 2007); *Niebauer v. Crane & Co., Inc.*, 783 F.3d 914, 923 (1st Cir. 2015) (rejecting the Third Circuit's approach as a "distinction without a difference"); *Plotnick v. Comput. Scis. Deferred Comp. Plan for Key Execs.*, 875 F.3d 160, 165 (4th Cir. 2017).

Nor would there be any *reason* to depart from *Firestone* in the context of top-hat plans, even if the court could buck binding Supreme Court precedent. While top-hat plans are exempt from some of ERISA's requirements, those plans are still ERISA plans. To subject some but not all ERISA plans to a different standard of review would defeat Congress's intent to create uniform standards of plan administration to facilitate the creation of benefit plans. And the Department of Labor has explained that employees participating in top-hat plans require the *least* protection because they are highly paid executives with greater bargaining power relative to other employees. DOL Op. Ltr. 90-14A, 1990 WL 123933, at *1. While the Third Circuit recognized that its approach "may … seem anomalous," it provided no less counterintuitive justification. *Goldstein*, 251 F.3d at 443.

**c.** Worse than simply disregarding the Administrator's interpretation, the district court claimed that ambiguities in the Plan must be construed *against* the administrator. A759. This Court has held that the rule of *contra proferentem* has some application in the ERISA context (*e.g.*, *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th

45

Cir. 2016); *Jones v. Am. Gen. Life and Acc. Ins. Co.*, 370 F.3d 1065, 1070 (11th Cir. 2004)). But "*contra proferentem* 'is based upon the principle of contract construction that when one party is responsible for the drafting of an instrument, *absent evidence indicating the intention of the parties,* any ambiguity will be resolved against the drafter.'" *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 554 (9th Cir. 1995). The doctrine provides a default rule that is subject to revision if the parties to a contract agree that a different rule should apply. And here, the Plans plainly specify that the Administrator has discretionary, binding interpretive authority. The *contra proferentem* doctrine simply has no relevance or application in such a case.

That is why seemingly *no* court applies the doctrine of *contra proferentem* where a plan contains a provision endowing a party with discretionary interpretive authority. In *Cagle v. Bruner*, the district court when "[f]aced with competing plausible interpretations … construed all ambiguities … against the Fund and concluded that the Fund's interpretation was arbitrary." 112 F.3d 1510, 1519 (11th Cir. 1997). This Court was unequivocal: "The district court erred in its 'reasonable interpretation' analysis." *Id.* The "arbitrary and capricious standard of review would have little meaning if ambiguous language in an ERISA plan were construed against the Fund." *Id.* This Court has thus "rejected *contra proferentem* in ERISA appeals, except during the first step" of the analysis in which it conducts a

46

*de novo* exploration of the language. *White v. Coca-Cola Co.*, 542 F.3d 848, 857 (11th Cir. 2008).

This Court is no outlier. The Sixth Circuit, for example, has held "that when *Firestone* applies" (*i.e.*, when the plan gives an administrator discretionary authority to interpret its terms), "a court may not invoke *contra proferentum* [sic] to 'temper' arbitrary-and-capricious review." *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 266 (6th Cir. 2018). Other courts agree. *E.g.*, *Winter*, 49 F.3d at 554 ("[T]he rule of *contra proferentem* is not applicable to self-funded ERISA plans that bestow explicit discretionary authority upon an administrator to determine eligibility for benefits or to construe the terms of the plan."); *Morton v. Smith*, 91 F.3d 867, 871 n.1 (7th Cir. 1996); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1101 (10th Cir. 1999); *Porter v. Lowe's Cos. Inc.'s Bus. Travel Acc. Ins. Plan*, 731 F.3d 360, 356 (5th Cir. 2013); *D & H Therapy Assoc. LLC v. Boston Mut. Life Ins. Co.*, 640 F.3d 27, 35 (1st Cir. 2011); *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 260-61 (4th Cir. 2009); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443-444 (2d Cir. 1995).

**d.** While we maintain that the district court erred in its *de novo* analysis of the Plan language at issue, it is apparent that the district court also applied an incorrect standard and failed to undertake steps two through six of this Court's framework to assess whether the Administrator's approach

47

was *reasonable*. Under the proper analysis, the outcome can only be in the Administrator's favor.

At step two, the Plans *do* grant discretionary interpretive authority to the Administrator. *See* pages 39-40, *supra*. And at step three, the interpretive arguments above show the reasonableness of the Administrator's interpretation. That reasonableness is only backstopped by the fact that the Administrator was advised by outside counsel and consultants from no fewer than three independent groups, all of whom agreed that the Plans permitted termination of the annuities by providing actuarially equivalent lump sums. The district court itself cited directly and extensively to these documents (A739-748); it was wrong to ignore their impact on the reasonableness of the Administrator's actions. And plaintiffs nowhere contended that a conflict of interest infected the decision to prevail at steps five and six. *See generally* R.151-1; R.161.

The district court accordingly could only grant summary judgment in the Administrator's favor on the question whether it could terminate the Plans by paying an actuarially equivalent lump sum.

## B.    The Administrator correctly—and at least reasonably—selected a 5% discount rate.

As just explained, the Administrator had the right to terminate the Plan and to carry out the termination by paying an actuarially equivalent lump sum—which the Administrator calculated by using a 5% discount rate

48

based on NCR's risk of default. There is no dispute, nor could there be, that *some* discount rate is required to determine actuarially equivalent lump sums. *E.g.*, *Holloman*, 443 F.3d at 839; *Call*, 475 F.3d at 817. Nonetheless, the district court conclusorily rejected the Administrator's choice of discount rate by asserting that it was "less than the value" of an NCR-backed lifetime annuity. A781-782. That conclusion is indefensible.

As a preliminary matter, the analysis must proceed using this Court's settled six-step framework. *See* pages 40-41, *supra*. We have already shown that Plan termination could appropriately be carried out by converting the annuities into an actuarially equivalent lump sum. The question then becomes whether the discount rate chosen—5% based on NCR's risk of default—produced that actuarially equivalent lump sum. The answer is plainly yes.

There cannot be any genuine dispute that a private annuity is worth more than an annuity from NCR, in part because the latter is subject to the risk that NCR will default. *See* A775. The district court rejected the notion that default risk was "an aspect of the fixed, static 'accrued benefits." But once again, the court confused how much participants were *paid* with the *value* of the benefit. Even plaintiffs' own experts agreed that default risk must be taken into account when discounting future cash flows to present value. R.157:26 & n.19. Indeed, in proceedings below regarding an appeal

49

bond, plaintiffs refused to accept a promise by NCR to pay in the future and instead insisted on a bond backed by a surety, tacitly *conceding* that the value of a promise by NCR to pay in the future is less valuable than a surety-backed commitment. That makes eminent sense: Top-hat plans are unfunded, and were NCR to default, plan participants would fare no better than any other unsecured creditor. When determining the value of such a benefit converted to present-day cash, a discount rate of 5% to account for NCR's creditworthiness is reasonable.

Indeed, NCR's numerous consultants each recommended that 5% was a reasonable discount rate in this instance. Towers Watson, one of NCR's consultants, had suggested using a discount rate between 5.25% and 10%. R.150-13:41. Aon Hewitt similarly suggested using a 5.25% discount rate. R.150-13:42. NCR management selected a lower discount rate (resulting in higher lump-sum payments) based on the market-determined interest rate on NCR's most recently issued ten-year bond. R.136-2:28-29. The district court did not consider this evidence of the Administrator's reasonability *at all*.

### C.    At the very least, the Administrator presented enough evidence to warrant a trial.

At the very least, the foregoing discussion demonstrates why the district court's *grant* of summary judgment to plaintiffs on liability was inappropriate. Summary judgment is possible only where there "is no genuine

dispute as to any material fact." Fed. R. Civ. P. 56(a). And courts must construe evidence in the light most favorable to the non-moving party (here, considering the award to plaintiffs, favorable to the Administrator). *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

The Administrator and its experts provided extensive evidence that neither the use of lump sums nor the chosen 5% discount rate would adversely affect the accrued benefits. Plaintiffs' own experts admitted that the conversion of an annuity into a lump sum *always* transfers longevity risk and investment risk. R.157:26 & n.19. They testified that they never made reductions in the value of lump sums to account for the shifting of this risk, nor were they aware of any authority suggesting such a reduction would be permissible. *Id.* And the Administrator's experts explained that mortality tables always apply population-wide assumptions without affecting asset value; and that investment risk transfer has net-zero effect because it eliminates the existing default risk and provides the opportunity to invest the lump sum to earn a greater return.

The district court impermissibly disregarded this record and expert evidence, all of which runs directly counter to its holding.

## II.   THE DISTRICT COURT ERRED IN AWARDING PLAINTIFFS A WINDFALL INCONSISTENT WITH THEIR OWN THEORY.

The district court further erred in fashioning a remedy. As NCR explained, given the theory of liability the district court embraced, it should

51

have simply accepted NCR's proposal to reinstate the original annuities; the district court was wrong to award prejudgment interest.

### A. Reinstating the annuities was the appropriate remedy given the district court's prior holdings.

In fashioning a remedy, a district court abuses its discretion if its ruling is "illogical." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009). That occurred here.

As to liability, the court held that the Administrator "was not permitted to unilaterally swap out the life annuities to which they were entitled for actuarially equivalent lump sum payments." A775. It based that holding on fundamental differences between annuities and lump sums. A771-772. The court nonetheless ordered plaintiffs to submit a proposed order requiring the Administrator to provide members of the Class "with amounts reflecting the difference between the lump sums they received and the cost of the replacement life annuities to which they were entitled." A783. In ordering relief, the district court directed that the Administrator make the very same lump-sum payments, with the very same shifting of investment and longevity risk, just using different assumptions as to the *amount* of the lump sum—i.e., that it must be enough to purchase a replacement annuity on the private insurance market in 2013.

Though the district court briefly attempted to claim that "lump sum" had a different meaning in ERISA than in ordinary parlance, that hardly

52

explains its incongruous order. A761 n.12. The court spent pages explaining that the Plans' statement that "benefits under the Plan shall be paid for the life of the former Participant" and that "[e]ach Participant shall be entitled to a benefit under this Plan expressed as single life annuity" meant that after any termination the Participants must still be receiving an annuity. A766-767. This was critical, because "the absence of longevity and investment risks were inherent aspects of the 'accrued benefits' (the life annuities) bargained for and promised under the Plans." A772. The result of the district court's remedial order, however, is that plaintiffs would *not* be "recover[ing] [the] benefits due to [them] under the terms of his plan" (29 U.S.C. § 1132(a)(1)(B)), as the district court construed it.

By contrast, the Administrator proposed a workable, equitable remedy that was fully consistent with the district court's summary judgment holding: reinstate the annuities. R.232:4.

This proposal was *fairer*, in that private annuities are more valuable and thus more expensive than annuities from NCR, which are subject to the risk of NCR's default. *See* pages 48-50, *supra*. Awarding plaintiffs the cost of a replacement annuity from a *private* insurer thus results in payment greater than the value of the accrued benefit—a windfall inconsistent with ERISA and the Plans' language. *Holloman*, 443 F.3d at 839.

The Administrator's proposal was *administrable*. Reinstating benefits, while adjusting for past underpayments or overpayments, avoids the need to speculate as to the size of award needed to make the class whole entirely.[14] Other courts have thus ordered reinstatement of annuities using similar reasoning. *E.g.*, *Milam v. Am. Elec. Power Long Term Disability Plan*, 2012 WL 5930590, at *4-5 (S.D. Ohio 2012); *Robertson v. Standard Ins. Co.*, 2015 WL 13682034, at *3 (D. Or. 2015).

The Administrator's proposal is the only one that was consistent with the district court's theory of liability. While the totals plaintiffs sought may have been enough to purchase a replacement annuity in 2013, there is nothing to suggest that those same amounts would be enough to purchase a similar annuity *today*. Increased payments will thus leave plaintiffs with their complained-of risks. Reinstating the annuities, by contrast, fully remedies

---

[14] The district court claimed that the proposal is "unworkable" because it "would involve complicated and disputed calculations." A793-794 n.4. That is not true; the Administrator's approach would simply involve subtracting the lump sums paid from the length of time without annuity payments times the rate of those payments—the difference between the amount paid and the amount that should have been paid. It is *plaintiffs'* proposal, requiring determination of the replacement cost of annuities 11 years ago, that requires "complicated and disputed" calculations. And the court's statement that "[p]urchasing replacement annuities that would have begun periodic payments a decade ago is no longer feasible or even possible" makes no sense. A794. The Plan *already* paid plaintiffs and class members significant sums. Reinstating the annuities (adjusting for those earlier payments) would function on a go-forward basis; the court provided no reason that such an approach would be unworkable.

54

the plaintiffs' alleged harms. The Administrator's proposal was thus by far the superior one, and the district court erred in dismissing it out of hand.

The district court rejected NCR's proposal on the ground that plaintiffs had not alleged a "breach" by terminating the Plans. A794. But that is beside the point. NCR's proposal is not to reinstate the Plans but instead to have the court order the benefits plaintiffs say they want—a life annuity from NCR. That is, NCR proposed to give plaintiffs exactly the value of the accrued benefits rather than an enormous windfall, as the district court's order impermissibly does. *Holloman*, 443 F.3d at 839.

## B.    Prejudgment interest is unwarranted where plaintiffs complain of having been paid too much, too quickly.

The district court below also awarded prejudgment interest "on the additional benefits that Defendant must pay to Plaintiffs and the Class." A802. The purpose of prejudgment interest is not to penalize a defendant, but to serve as "compensation to the plaintiff for the use of funds that were rightfully his." *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 710 (11th Cir. 2005). While the district court enjoys broad discretion in determining whether to award prejudgment interest, "it is not axiomatic that such interest should be awarded simply because, as here, the prevailing party has demonstrated entitlement to the funds." *Mendez v. Teachers Inc. & Annuity Ass'n & College Ret. Equities Fund*, 982 F.2d 783, 790 (2d Cir. 1992). Rather, prejudgment interest "should be awarded only in cases where such an

award is 'fair, equitable and necessary to compensate the wronged party fully.'" *Id.*

The district court spent three sentences determining that plaintiffs were entitled to prejudgment interest. It stated—without any analysis or justification—that "Class members … have been wrongfully deprived of a portion of the retirement benefits due to them under the Plans for over a decade." A802. But that simply is not true. Rather than being denied the use of money, the class received payment *sooner* than they would had the Administrator not terminated the plan, and *sooner* than they would have had the Administrator or participants purchased replacement annuities. The district court's own example—in which Plaintiff X received $1.273 million for his $103,131 annual annuity—makes that crystal clear. A774-775. Prejudgment interest was unnecessary to make participants whole because they all received *more* money *earlier* than they otherwise would have.

The Second Circuit has explained that "[a]n award of prejudgment interest … must not result in over-compensation of the party to whom judgment has been awarded." *Mendez*, 982 F.2d at 790. That is the precise result of the district court's order. Its holding was predicated on a fact—that plaintiffs were deprived of funds—that was clearly erroneous. "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in

making a determination, or makes findings of fact that are clearly errone-ous." *Barber v. Krepp*, 680 F. App'x 819, 820 (11th Cir. 2017).

## CONCLUSION

The Court should reverse and remand for entry of judgment for the Administrator.

Dated: September 11, 2024      Respectfully submitted,

*/s/ Paul W. Hughes*
PAUL W. HUGHES
SARAH P. HOGARTH
CHARLES SEIDELL
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,994 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: September 11, 2024          */s/ Paul W. Hughes*


## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2024, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: September 11, 2024          */s/ Paul W. Hughes*